by a fine  *  *  *  and may also be imprisoned in a county jail or penitentiary for a term of not more than one year."

In the Frank Case the court said:

"The appellant contends that under section 34 of the liquor tax law the selling of liquor without a liquor tax certificate is made a misdemeanor punishable by fine, and that no forfeiture of the liquor tax certificate thereafter procured or of the rebate thereon is prescribed by the statute.  *  *  *  It is true that subdivision 1 of section 34 of the liquor tax law prescribes a punishment by fine and does not provide for a forfeiture of the liquor tax certificate or of the rebate, but the provisions of section 25 of the law providing for a rebate impose certain conditions to the attaching of a right to the rebate."

Bearing in mind that the Legislature had to make some difference between a principal who came within subdivision 1 of section 34 and an employé of a certificate holder, subdivision 2 of section 34 provided that:

"Any  *  *  *  person who  *  *  *  shall violate any of the provisions of sections sixteen, twenty-one, twenty-two, twenty-three, twenty-four, thirty and thirty-one shall be guilty of a misdemeanor, and upon conviction thereof shall be punished by a fine  *  *  *  and shall forfeit the liquor tax certificate and be deprived of all rights and privileges thereunder, and of any right to a rebate of any portion of the tax paid thereon, and such certificate shall be surrendered to the officer who issued it  *  *  *  but this clause does not apply to violations of section thirty-one of this act by a person not holding a liquor tax certificate, the punishment for which is provided in the first clause of this section."

The violation in the Frank Brewery Case occurred under subdivision 1 of section 34, but in the case at bar it is a violation under subdivision 2 of that section, and, where a person not a certificate holder violates section 31 of the law, subdivision 2 of section 34 expressly provides that the only punishment shall be a fine, and not the forfeiture of a liquor tax rebate on the license obtained. This express exception of the statute is so clear that it does not require any further discussion.

A writ of mandamus should issue as prayed.

---

KLAUCK v. FEDERAL INS. CO. et al.

(Supreme Court, Special Term, Erie County.   June, 1908.   On Reargument, July, 1908.)

1. RELEASE—AUTHORITY TO RELEASE—MARINE INSURANCE—SALVAGE CONTRACT.
     Certain insured steamers having been driven ashore, a wrecking company contracted with the underwriters to release the vessels for a specified sum and to commence work as soon as they could assemble the plant, and guaranteed to complete the same before April 15, 1907. *Held* that, the owners of the vessels not being parties to such contract, the underwriters had power to release the wrecking company from any liability for damages sustained by reason of their failure to comply with such agreement.
     [Ed. Note.—For cases in point, see Cent. Dig. vol. 42, Release, § 1.]

2. CONTRACTS—ACTION FOR BREACH—PERSONS ENTITLED TO SUE.
     The owner of the vessels, having no legal interest in the salvage contract, had no cause of action for its breach.

**3. SAME.**

To entitle a third person to sue on a contract, it must appear that he was the person intended to be benefited thereby.

**4. INSURANCE—MARINE INSURANCE—DELAY OF WRECKERS.**

Where, on the stranding of certain vessels, the underwriters contracted with a wrecking company to float the vessels for a specified sum by April 15, 1907, but the vessels were not released until July 1st following, the owners were entitled to recover from the underwriters its damages for the delay, not by virtue of the wrecking company's contract, but under the policies of insurance.

**5. GUARANTY—DISTINGUISHED FROM INDEMNITY.**

On the grounding of certain insured steamers, the underwriters made a contract with a wrecking company to release the steamers for a specified price; the contract containing a provision that the wrecking company further guaranteed to release the steamers before April 15, 1907. The steamers were not released until July 1, 1907, which resulted in damage to the owner thereof. *Held*, that the agreement between the underwriters and the wrecking company did not amount to a guaranty, but was a mere contract of indemnity, and ·hence, until the underwriters had been compelled to pay such damages to the owner, they were not entitled to set them off against its liability to the wrecking company's assignee for the contract price of the salvage services.

**6. RELEASE—OPERATION AND EFFECT.**

On the stranding of certain streamers, underwriters contracted with a wrecking company to float the steamers by April 15, 1907, for · a specified sum. The owner was not a party to this contract, and suffered damages from the wrecking company's failure to release the vessels until July 1, 1907. The wrecking company's assignee sued the underwriters for the contract price of the salvage services, whereupon the owner contracted with the underwriters that, in consideration of its being permitted to defend such suit and the underwriters' agreement to pay such part of the agreed value of the salvage services as the plaintiff in the suit should not recover against them to the owner, the latter released all claims against the underwriters, except so far as they could be worked out in such action. *Held*, that the underwriters, not having paid the owner any sum in satisfaction of such damages, and not being, therefore, entitled to recover either against the wrecking company or its assignee therefor, such release constituted a valid defense to the underwriters' claim for such damages.

### On Reargument.

**7. SET-OFF AND COUNTERCLAIM—PARTIES TO CROSS-DEMAND—TRUSTEE OF EXPRESS TRUST.**

On the stranding of certain insured vessels, the underwriters made an independent contract with a wrecking company to float the vessels within a specified time, to which the owner of the vessels was not a party. The wrecking company not having performed the work within the time prescribed, the owner, having been damaged by the delay, released the underwriters from their liability under the policies for such damages, except as they could be worked out in the suit of the wrecking company's assignee against the underwriters for the contract price of the salvage services. The underwriters' answer in· such suit alleged that the contract was entered into and the guaranty of time therein inserted for the express benefit and use of the owner, and to enable defendants to perform their obligations to the owner by virtue of their policies. It also set out the contract with the wrecking company, which disclosed neither benefit to nor interest on the part of the owner of the· vessel. *Held*, that the underwriters were not entitled to prosecute a counterclaim for the owner's damages for the delay of the wrecking company as trustees of an express trust for the benefit of the owner.

Action by John W. Klauck against the Federal Insurance Company and others. On demurrer to certain portions of plaintiff's reply to defendants' answer alleging counterclaims. Overruled.

George Clinton, for plaintiff.

H. Tracey Duncan and Daniel J. Kenefick, for defendants.

WHEELER, J. The following essential facts appear by the pleadings in this case:

In January, 1907, two steam vessels owned by the United States Transportation Company were driven ashore and stranded by reason of a violent gale occurring at that time. The vessels were insured against such marine perils under policies of insurance issued by the defendants as underwriters. The underwriters, as they had the right to do under their policies, undertook to release and float the stranded vessels. Proposals for doing the work were invited, and the Donnelly Salvage & Wrecking Company, Limited (plaintiff's assignor), made an offer to release the vessels for the sum of $39,500. The proposal contained, among other things, the following:

"Work to commence as soon as we can assemble the plant and proceed with all possible dispatch. We further guarantee that we will release these steamers before the 15th of April, 1907."

The offer was accepted by the underwriters, and the wrecking company began work, but did not succeed in releasing the stranded vessels until about July 1, 1907. The plaintiff, as the assignee of the claim of the wrecking company, sues to recover from the defendants the contract price for releasing the vessels.

The defendants answered, and by way of counterclaim set up the issuing of the insurance policies upon the stranded vessels; that the United States Transportation Company, as owner, had the right to under such policies to safeguard and recover the steamers and to charge the defendants with the cost thereof according to the amount of their insurance; that under such conditions the defendants invited the proposal from the wrecking company, which was subsequently accepted and became the contract sued on. However, before accepting said offer, it is alleged the defendants entered into an agreement with the transportation company, the owner of the vessels, that it would waive its right under said policies to release said steamers by its own efforts, and permit the defendants to release them, and for that purpose enter into a contract with the wrecking company on the terms contained in its proposal; that said contract with the wrecking company was entered into for the purpose of enabling the defendants to perform their obligations to the owner, all of which was known to the wrecking company; that by reason of the delay of the wrecking company to release and float said vessels by April 15, 1907, the transportation company was deprived of their use from said date to the time they were in fact gotten off the beach, and thereby the defendants were damaged in the sum of $39,258.20, being the fair rental or charter value of said steamers for the time between said 15th of April, 1907, and the time the vessels were actually released. The answer also further alleges that the transportation company, in order

to reduce the delay and thereby diminish the damages, expended $9,-
624.50 in releasing the said steamers, which sum, in addition to the
$39,258.20 above mentioned, the defendants ask to be set off against
the plaintiff's damages, if any, in respect to the matters complained
of in the plaintiff's complaint.

The plaintiff replied to the counterclaim set forth in the answer,
and, among other things, by the tenth paragraph of the reply alleged
that the defendants entered into a certain agreement with the trans-
portation company, the owners of said vessels, which agreement is
set forth in full in the reply. This alleged instrument sets forth many
stipulations of the parties to it, which is unnecessary here to quote.
The essential parts, however, so far as they relate to the questions
here involved, provide in substance that the underwriters, the de-
fendants here, will turn over the defense of this action to the trans-
portation company, and that the attorneys for the transportation com-
pany shall appear for the defendants in this action and conduct the
defense, with power to set up any defense, set-off, or counterclaim
which the transportation company may desire to set up. The defend-
ants, the underwriters, agreed to pay any judgment recovered against
them in this action, not exceeding the sum of $39,500, and, in case
the recovery is less than $39,500, to pay the transportation company
the difference between the amount of such judgment and the sum of
$39,500. The instrument contained the following clauses:

"The United States Transportation Company is to dismiss at its own costs
the suit brought by it against these underwriters in the Supreme Court of
Erie county, New York, and the suit against the Donnelly Salvage & Wreck-
ing Company brought by it in the court of common pleas of Cuyahoga coun-
ty, Ohio, and will enforce whatever claims for damages or otherwise, of what
nature or description soever, which it may have against the underwriters or
Mr. R. Parry-Jones, arising out of or in any manner connected with the
underwriters' operations in salving and releasing said boats after they had
been stranded in the month of January, 1907, or the contract for such salvage
and release, through the underwriters' right to recoup or recover over there-
for against the Donnelly Salvage & Wrecking Company, in the pending ac-
tion by Klauck, or in such other action as may be brought by the Donnelly
Salvage & Wrecking Company, or its assignee; and the United States Trans-
portation Company hereby releases said claims against underwriters and
Mr. Parry-Jones, except so far as they can be worked out in the Klauck
action in the manner above stated, and agrees that it will never enforce or
prosecute said claims in any proceeding or manner whatsoever against under-
writers or said Parry-Jones. The United States Transportation Company
agrees at its own expense and by means of its own attorneys to carry on
the defense of the case of John W. Klauck v. Federal Insurance Company et
al., and also to defend at its own expense and by its own attorneys any other
suit now begun or which may be begun by the Donnelly Salvage & Wrecking
Company, or its assignee, against the underwriters on the steamers Notting-
ham and Smith, by reason of the salving and releasing of said vessels, or
either of them, at Buffalo, in the year 1907. Nothing herein contained is
intended to operate as a release of underwriters from any legitimate liability
to owners arising out of the policies of insurance themselves—such, for in-
stance, as expenses properly incurred by owners under said policies in con-
nection with said disaster, or other disasters, none of which liabilities are
to be either acknowledged on the one hand or prejudiced on the other by
this agreement: Provided, however, that no allegation made or act done by
owners in connection with the litigation hereby turned over, and no result
or effect of said litigation, shall ever be held to prejudice the underwriters
or increase their liability under said policies."

The reply then alleges that pursuant to said agreement the said transportation company has in fact assumed the conduct of the defense of this action and set up the alleged counterclaims, and that by reason of the premises the transportation company "has waived any and all claims which it has or may have against the said defendants for or on account of delay in releasing said vessels, or either of them, or for or on account of any expenses incurred in attempting to release said vessels, or otherwise," and therefore are not entitled to counterclaim or offset any claim for damages which they have against the Donnelly Salvage & Wrecking Company, etc.

The defendants demur to this portion of the reply upon the ground that said reply to the counterclaim is insufficient in law to constitute a defense to said counterclaim. The question thus presented is whether, under the facts alleged, the defendants can avail themselves of damages sustained by themselves or the transportation company for failure to release the vessels in question by April 15th as agreed, without first having paid to the transportation company the amount of such damages. The right to avail themselves of such counterclaims will turn upon the interpretation to be given the agreement to release the vessels, made between the wrecking company and these defendants. If this agreement is to be deemed a contract of indemnity, then the defendants cannot call on the wrecking company or its assignee to respond in damages for delay until the defendants have in fact made payment to the transportation company. If, on the other hand, the contract is to be construed to be one against liability, then the defendants' cause of action is complete without actual payment of the damages sustained by the transportation company.

The contract sued on was made by the plaintiff's assignor with the defendants, and not with the transportation company. There is no privity of contract between the wrecking company and the transportation company. It was not made primarily for the benefit of the transportation company, but for the benefit of the underwriters, these defendants, who had undertaken by arrangement with the owner to release the steamers. The wrecking company promised to do nothing for the transportation company. The transportation company had no control over the contract. The underwriters were at liberty to cancel their contract with the wrecking company (if the dredging company assented) and make a new arrangement with others to release the steamers. The transportation company would have had nothing to say as to such a cancellation. The underwriters might release the wrecking company altogether from any liability or damages sustained by reason of their failure to keep the agreement, and the vessel owner would have had no right to interfere. We mention these things to show that the owners had no legal interest in the contract in question, and therefore no cause of action for its breach. This subject has been frequently under consideration by the courts of this state, and the conclusions above stated are supported by many decisions. Judge Rapallo said, in the case of Garnsey v. Rogers, 47 N. Y. 233, 7 Am. Rep. 440, when speaking of the doctrine of Lawrence v. Fox, 20 N. Y. 268, that he did not understand that the case went so far as to hold that every promise made by one person to another,

from the performance of which a third person would derive a benefit, gives a right of action to such third party; he being privy neither to the contract nor to the consideration. To entitle him to an action, the contract must have been made for his benefit. He must be the party intended to be benefited. To the same effect are the cases of Vrooman v. Turner, 69 N. Y. 280, 25 Am. Rep. 195; Pond v. New Rochelle Water Co., 183 N. Y. 330–336, 76 N. E. 211, 1 L. R. A. (N. S.) 958; Embler v. Hartford Steam Boiler Insurance Co., 158 N. Y. 431–436, 53 N. E. 212, 44 L. R. A. 512; Rochester Dry Goods Co. v. Fahy, 111 App. Div. 752, 97 N. Y. Supp. 1013.

We must therefore conclude that the transportation company had no cause of action against the wrecking company for damages by reason of its failure to release the steamers by April 15, 1907. On the other hand, the transportation company did have the right to recover from the underwriters its damages for delay in releasing the steamers, not by virtue of the wrecking company's agreement, but under the policies of insurance issued by the defendants, and if the defendants had paid such damages the defendants would have had a cause of action over against the wrecking company for its failure to float the steamers by April 15th, as agreed in its contract with the underwriters. Oceanic Steamship Co. v. Compania T. E., 134 N. Y. 461, 31 N. E. 987, 30 Am. St. Rep. 685; Mayor v. Brady, 151 N. Y. 611, 45 N. E. 1122: Dunn v. Uvalde Asphalt Co., 175 N. Y. 217, 218, 67 N. E. 439. One who, without default on his part, has been held legally liable for the default or negligence of another, is entitled to indemnity from the latter, whether contractual relations exist between them or not.

While these propositions are true, the question still remains in this case whether the underwriters may maintain an action to recover for the breach of the wrecking company's contract to release the steamers by April 15, 1907, before they have in fact paid anything to the transportation company. The decision of this question turns, it would seem, upon whether the guaranty to release and float the steamers by April 15th is to be construed as a guaranty against liability or a contract of indemnity. The contract of the wrecking company is set forth in full in the defendants' answer, and is as follows:

"We hereby offer to release steamers H. W. Smith and William Nottingham from their present position ashore on the beach, and deliver them safely afloat at their moorings, inside the breakwater, for the lump sum of $39,500, this sum to include both vessels. Work to commence as soon as we can assemble the plant, and proceed with all possible dispatch. We further guarantee that we will release these steamers before the 15th of April, 1907. It is further agreed that satisfactory proof shall be produced, if required, of our ability to perform the work mentioned, and the method adopted for floating shall be subject to the approval of owners' and underwriters' representatives. Payment to be made upon a faithful completion of contract."

It will be seen that there is no express guaranty on the part of the contractor to indemnify against liability, and so far as that is concerned none to indemnify against loss. Nevertheless the law implies, and supplies from the language used, certain agreements and covenants, and in determining what those are in this particular case we

must apply and enforce certain well-recognized principles of construction.

A very recent and important case bearing on the question involved is that of Dunn v. Uvalde Asphalt Paving Co., 175 N. Y. 217, 67 N. E. 439, where the plaintiff, a subcontractor, sued the general contractor for work, labor, and services rendered, and the general contractor set up as a counterclaim damages alleged to have been sustained owing to the negligent performance of the work, by which third persons suffered injuries for which the general contractor became liable. Some of these damages had not been paid by the defendants, but actions for their recovery were pending. The court held that, although the subcontractor stood in the relation of an indemnitor to the person held legally liable, nevertheless the general contractor had no right to a counterclaim until the damages had been actually paid. The court said that:

"The contract of indemnity implied by law in favor of one who is legally liable for the negligence of another covers loss or damage, and not mere liability"—citing Sedgwick on Damages, § 785; Oceanic S. N. Co. v. Compania T. E., 134 N. Y. 461, 31 N. E. 987, 30 Am. St. Rep. 685; Village of Port Jarvis v. First National Bank, 96 N. Y. 550.

In Brown v. Mechanics' & Traders' Bank, 16 App. Div. 207, 44 N. Y. Supp. 645, it was held that where the president of a bank had given a bond and mortgage for the benefit of the bank, which was subsequently foreclosed, resulting in a deficiency judgment against the president personally and in his individual capacity, the implied contract of indemnity arising therefrom did not require the bank to pay the amount of such judgment until the president had actually paid the judgment. See, also, the cases of Howe v. B. N. Y. & E. R. R. Co., 37 N. Y. 297, and Maloney v. Nelson, 144 N. Y. 182, 39 N. E. 82.

In the case of Maloney v. Nelson, 144 N. Y. 182, 39 N. E. 82, a mortgage had been given to one who had gone upon the bail bond of another. The mortgage recited the mortgagee had signed such bail bond and that the mortgagor was "desirous of indemnifying and saving harmless" said mortgagee "from all loss or damage on said bond." The prisoner had failed to appear and his bond became forfeited, and the mortgagee began a foreclosure of the mortgage given for his protection, and in the absence of proof that the mortgagee had paid any money by reason of the bail bond it was held the action could not be sustained.

The cases cited are sufficient to illustrate the general rule which prevails in cases of this character. The counsel for the defendants, however, contend that the case at bar takes it out of the general rule and forms one constituting exceptions to it. It is contended that the contract to release the steamers "was not only an express agreement to do the thing, but an agreement to indemnify defendants against their liability to the owner in the event that the thing was not done." The defendants cite and particularly rely on the cases of Lothrop v. Atwood, 21 Conn. 117, and of Trinity Church v. Higgins, 48 N. Y. 532, as sustaining their contention.

In the Connecticut case there was an agreement by one to pay certain firm debts and an express agreement to save the plaintiff from "liability" by reason thereof. So in that case the plaintiff stood upon the express terms of the contract, not upon any implied agreement. As said in Brown v. Mechanics' & Traders' Bank, 16 App. Div. 207, 44 N. Y. Supp. 645, it was competent for the parties to make any contract they choose. So that the facts in the Lothrop Case seem to take it out of the general rule that the law will not, in the absence of express agreement against liability, imply one by construction.

In the case of Trinity Church v. Higgins, 48 N. Y. 532, a tenant in his lease covenanted and agreed to pay an assessment levied. against the leased property. He failed to do this, and it was held the lessor might maintain an action against the lessee for damages without first paying these assessments. The reason for this holding is fully explained in Maloney v. Nelson, 144 N. Y. 187, 39 N. E. 82, because, as the court explained, the covenant of the lessee was a primary, and not a collateral or secondary, one in its terms. The court said:

"Thus, if A. entered into a bond to pay money to B. at a certain time, and C. thereupon entered into another bond to A. to himself pay that money to B., in such case C. becomes liable to pay the money, and the condition of the bond is broken by the failure to pay, and A. has a right of action against C. to recover the money, without proof that A. has paid his bond to B. But where the real purpose of the undertaking is indemnity against loss or damage to be sustained from a payment by A. of the obligation which he has entered into, then the surety to A. can be proceeded against and a recovery had from him only upon proof that A. has paid the money or some portion of it which he was obliged to pay."

In the first instance C. made himself the debtor to B., and, as held in the case of Trinity Church v. Higgins, the defendant was not at liberty to say the assessments were the debts of the lessor and that he must pay them, because the assessments were by his covenants the lessee's own debts. These elements are lacking in the case at bar. There is no privity of contract with the owners. The owners of the steamers are not mentioned in the contract. The wrecking company undertook to do nothing for the transportation company. The engagement of the wrecking company was wholly and entirely with the underwriters. It is true the wrecking company in its offer to the underwriters used this language:

"We further guarantee that we will release these steamers before the 15th of April, 1907."

This, however, is nothing more or less than an agreement to release by the day named, and the agreement would be just exactly as strong if the wrecking company had simply said: "We further agree that we will release," etc. It guarantees nothing in any event to the owners, and cannot be construed as a guaranty for the owners' benefit. The court, under well-known rules of construction, cannot spell into the agreement an agreement for the benefit of the owners by implication. A guarantor, like a surety, is bound only by the strict letter or precise terms of his contract. Creamer v. Mitchell, 162 N. Y. 486, 56 N. E. 977; McAfee v. Wyckoff, 44 Misc. Rep. 382, 89 N. Y. Supp. 996; Id., 112 App. Div. 892, 97 N. Y. Supp. 1140;

Beagle v. Cable, 55 App. Div. 158, 66 N. Y. Supp. 809. It is true the answer of the defendants setting up the counterclaim in dispute alleges that the contract of the underwriters with the wrecking company was for the express benefit and use of the owner; but that is denied in the reply, and upon the disposition of this demurrer the denial of the reply must be treated as true. Beach v. Berdell, 2 Duer, 327.

There are manifest reasons why a guaranty should not be enlarged into one against liability, except where there is a clear intent so to do. As a rule one should not be required to pay another for loss or damages until such other has himself paid the claim, for until that has been done it cannot be said to be certain that the person indemnified will ever have to pay anything at all. The reasons against construing an agreement of indemnity into one against liability gain additional force when the claims are uncertain and unliquidated in amount, such as the one at bar necessarily is.

What we have so far said renders it unnecessary to discuss the proposition advanced by the defendants' counsel that they have the right to sue and recover full damages as trustees for the benefit of the owners. We must conclude, therefore, that in this case the true construction of the guaranty of the wrecking company is one against loss, and not one against liability, by reason of a failure to release the vessels by April 15th; and it follows, of course, that these defendants are in no position to assert any claim by way of counterclaim or offset until they have actually paid the transportation company, the owners of the steamers, the damages sustained by the transportation company. Inasmuch, however, as the transportation company has agreed with the defendants by which it "releases said claims against the underwriters and Mr. Parry-Jones, except so far as they can be worked out in the Klauck action in the manner above stated, and agrees it will never enforce or prosecute said claims in any proceeding or manner whatsoever against underwriters or said Parry-Jones," it would appear that such an arrangement constituted a good reply to the counterclaim set up in the answer.

For these reasons, we are of the opinion that the demurrer must be overruled. So ordered, with leave to withdraw demurrer upon payment of the costs of this demurrer, and plead over.

On Motion for Reargument of Demurrer.

Counsel for the defendants insist this court has failed to make the proper distinction between the allegations of the answer as to the counterclaims therein set forth to which the plaintiff replied. In the second clause of the answer the defendants allege that the contract with the wrecking company was made solely for the benefit of the defendants. In the third paragraph of the answer the defendants allege in substance the stranding of the vessels, the insurance of said vessels by defendants against marine perils, and that under such policies the owners of the vessels had the right to release them, for the expense of which the defendants agreed to contribute according to the amount of their insurance, and were under obligations to reim-

burse the owner for its charges and expenses therein, and that while the steamers were so aground the owner agreed with the defendant to waive its right under said policies to release the vessels by its own efforts, and in lieu thereof would permit the defendants to release them and employ the plaintiff's assignor for that purpose and contract with the wrecking company on the terms of its proposal—

"for the benefit and use of said United States Transportation Company; * * * that said contract was entered into, and especially the guaranty as to time therein inserted, for the express benefit and use of the United States Transportation Company, the owner of said steamers, and for the purpose of enabling defendants to perform their obligations to said company under and by virtue of their said policies, * * * all of which was well known to the Donnelly Salvage & Wrecking Company."

In other words, the defendants have undertaken to assert that in making the contract for the release of the vessels, and in setting up the alleged counterclaim for damages for not releasing the vessels until after April 15th, they were acting as trustees for the owner of the vessels, and argue that they had the right to assert the alleged counterclaim as the trustees of an express trust, and that consequently any release by the vessel owner of the underwriters from liability could not defeat a recovery in defendants' favor as the representatives of an express trust. Defendants' counsel argues that, while a release might bar a recovery in so far as the defendants asserted a counterclaim in their own right, such a release would not avail the plaintiff in so far as the counterclaims are asserted by the defendants as trustees for the owner; and herein it is claimed the court in its former opinion failed to make the proper distinction.

The learned counsel for the defendants discussed the point fully in his brief submitted on the former argument, and the cases there cited were all carefully examined by the court. The court was not, however, impressed at that time with the soundness of the position taken, and a re-examination of the question has not changed its views in this regard. It is true that in the paragraph or clause of the answer above quoted the defendants allege that the contract with the wrecking company was made "for the benefit and use of said United States Transportation Company." This allegation, however, cannot be deemed controlling in the disposition of the question presented, because the contract itself between the underwriters and the wrecking company is set forth in full in the answer, and·the rights and obligations of the parties must be determined by the terms of that instrument, and not by some allegation as to its legal force and effect, which at most is but pleading a conclusion of law.

We are of the opinion that the contract was not primarily to secure a benefit to the owner, but to prevent loss to the underwriters, whether that loss might come from being obliged to pay damages to the owner for a failure to release the vessels within a reasonable time, or whether from delay in releasing the vessels, which might result in an abandonment by the owner from a constructive total loss or from whatever cause. We need only repeat what we said in our former opinion:

"The contract sued on was made by the plaintiff's assignor with the de fendants, and not with the transportation company. There is no privity of contract between the wrecking company and the transportation company. It was not made primarily for the benefit of the transportation company, but for the benefit of the underwriters, these defendants, who had undertaken by an agreement with the owner to release the steamers. The wrecking company promised to do nothing for the transportation company. The transportation company had no control over the contract. The underwriters were at liberty to cancel their contract with the Wrecking Company (if the Wrecking Company assented) and make a new arrangement with others to release the steamers. The Transportation Company would have had nothing to say as to such cancellation. The underwriters might release the Wrecking Company altogether from any liability or damages sustained by reason of their failure to keep the agreement and the vessel owner would have had no right to interfere."

We might have added that the transportation company incurred no liability whatever to the wrecking company for the payment of the contract price for releasing the vessels, and that, had the wrecking company become insolvent, so as to have been unable to respond in any event for damages sustained by a failure to perform its contract, the underwriters would still have remained liable to the owner for such damages as it might have sustained thereby. This contract was addressed to defendants' agent, and accepted by them, and reads as follows:

"We hereby offer to release the steamers H. W. Smith and William Nottingham from their present position ashore on the beach and deliver them safely afloat at their moorings, inside the breakwater, for the sum of $39,-500, this sum to include both vessels. Work to commence as soon as we can assemble the plant and proceed with all possible dispatch. We further guarantee that we will release these steamers before the 15th of April, 1907. It is further understood that satisfactory proof shall be produced, if required, of our ability to perform the work mentioned, and the method adopted for floating shall be subject to the approval of owner's and underwriters' representatives. Payment to be made upon faithful completion of contract."

We are unable to find anything in the facts pleaded in the counterclaim in question which justifies the position that the underwriters were acting in this matter as trustees of an express trust. On the contrary, no trust whatever is expressed in the contract. There is nothing to suggest that the underwriters were in any way acting in a representative capacity in making the contract, or otherwise than for their own benefit. The very allegations of the answer preclude the inference of the existence of any trust. It alleges that the transportation company had the right under the provisions of the insurance policies to release the steamers, and that the defendants were under obligation under said policies to reimburse the owner for its charges and expenses in so doing. The answer then continues:

That said "transportation company agreed with said defendants that it would waive its right under the policies to release said steamers by its own efforts and means, and require defendants to reimburse it for its charges and expense therein, and in lieu thereof would permit defendants to release said steamers, and for that purpose to employ said Donnelly Salvage & Wrecking Company, Limited, and contract with said company on the terms of its said proposal for the benefit and use of said United States Transportation Company, and defendants thereupon accepted the said proposal of the Donnelly Salvage & Wrecking Company."

Later in the paragraph setting up this counterclaim the defendants allege that:

"The defendants have been damaged in the sum of $39,258.20, and the further sum of $9,624.50, for all of which the defendants are liable over to the said the United States Transportation Company."

We are unable to spell into the case any trust, either express or implied, from either the contract itself or from the essential and controlling allegations of the answer. A case somewhat analogous to that under consideration here is that of Newton v. Lee, 139 N. Y. 332, 34 N. E. 905. See, also, Elliott v. Brady, 192 N. Y. 221, 85 N. E. 69; Gillespie v. Torrence, 25 N. Y. 306, 82 Am. Dec. 355; Lasher v. Williamson, 55 N. Y. 619.

We have reached these conclusions independent of the consideration of the affirmative denial contained in the plaintiff's reply, denying that allegation of the answer that the contract with the wrecking company was for the benefit of the transportation company. Whatever the effect of that denial may be, the same result must be reached, in view of the terms of the contract and the facts pleaded in the answer upon which the counterclaims in question are based.

For these reasons, the motion for a reargument is denied, with costs of motion. So ordered.